| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-11121-JGD |
| | ) | |
| LETTER FROM ALEXANDER HAMILTON | ) | |
| TO THE MARQUIS DE LAFAYETTE DATED | ) | |
| JULY 21, 1780 | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| ALDRICH L. BOSS, as Personal Representative for | ) | |
| the ESTATE OF STEWART R. CRANE, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COMMONWEALTH OF MASSACHUSETTS, | ) | |
| acting by and through THE MASSACHUSETTS | ) | |
| ARCHIVES, | ) | |
| Claimants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' MOTION TO STRIKE THE CLAIM OF CLAIMANT ALDRICH L. BOSS AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF STEWART R. CRANE

The United States of America, by its attorney, Andrew E. Lelling, United States Attorney for the District of Massachusetts, submits this memorandum of law in support of its motion to strike the claim of Claimant Aldrich L. Boss, as Personal Representative for the Estate of Stewart R. Crane ("the Estate") for lack of standing, in accordance with Supplemental Rule G(8)(c) of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims.

## I.    INTRODUCTION

In December 2018, the Potomack Company ("Potomack"), an auction house in Alexandria Virginia, received a letter from Alexander Hamilton to the Marquis De Lafayette dated July 21, 1780 (the "Letter"), for consignment and sale at an upcoming auction.  Potomack researched the Letter, through methods including an internet search and inquiries to the Commonwealth of Massachusetts

Archives (the "Archives"), and learned the Letter had been stolen from the Archives. As a result, Potomack contacted the Federal Bureau of Investigations ("FBI"). Pursuant to a seizure warrant, the FBI took possession of the Letter, and the United States filed this civil forfeiture action. The Archives filed a claim. The fact that the Letter came from the Archives, and is stolen, is not in dispute.

The Estate also filed a claim asserting that it "is the owner of record" of the stolen Letter, and in answers to special interrogatories directed at standing, the Estate asserted, on information and belief, that the Letter had been purchased by a family member in 1945. The Estate's claim, however, should be stricken for lack of standing because the Estate cannot, as a matter of law, establish an ownership interest in the stolen Letter. The Estate lacks standing for the following reasons—each reason alone being sufficient to strike the claim:

First, the Letter is a public record of the Commonwealth of Massachusetts, and *only* the Commonwealth can own the Letter. Since at least 1897, the Massachusetts Public Records Act has prohibited the removal or alienation of historical public records, such as the Letter, from the Commonwealth's care and custody. As a result, the Commonwealth (which has also filed a claim to the Letter), and *only the Commonwealth*, can lawfully own the Letter.

Second, one cannot transfer title to stolen property, even to an innocent purchaser. At all times that the family claims to have had the Letter, it was stolen property. Thus, regardless of how the stolen Letter came to the family and then moved among various family members, no one in the family ever, at any time, had good title to the Letter. Thus, at no time could anyone in the family transfer good title, receive good title, or own the stolen Letter.

Third, only owners can prevail under 18 U.S.C. § 983(d)(6)(A), and Section 983(d)(4) does permit ownership claims to "contraband or other property that it is illegal to possess." Not only does Massachusetts law require the return of public records to the Commonwealth, federal and state laws prohibit trafficking in and possession of stolen property, such as the stolen Letter.

Fourth, and finally, the Estate's claim fails because it is untimely.

For each of these reasons, the Estate lacks standing to assert a claim to the stolen Letter, and its claim should be dismissed.

## II.     BACKGROUND

**A.     The Hamilton Letter Was Sent to the Massachusetts Government in 1780 and Stolen from the Commonwealth 150 Years Later.**

### 1.     During the Revolutionary War, Hamilton's Letter Was Sent to the Massachusetts Government as Part of a Request for Military Aid, and Became a Public Record.

It is undisputed that the Letter is an authentic letter from Alexander Hamilton.  In the midst of the Revolutionary War, on July 21, 1780, Alexander Hamilton, Aide de Camp to General George Washington, wrote to the Marquis de Lafayette about British troop movements.  Specifically, as Hamilton relayed, sources reported "that the enemy are making an embarkation with which they menace the French fleet and army" in Rhode Island.  *See* Verified Complaint ("V. Compl."), Ex. A (Docket No. 1).  Massachusetts General William Heath then forwarded this military intelligence, and the Hamilton letter, to the President of the Council for the State of Massachusetts[1] in a letter dated July 25, 1780, sent from Newport, Rhode Island (the "Heath Letter").  Heath wrote "[a] few minutes since the intelligence contained in the enclosed came to hand, in consequence of it Count Rochambeau has demanded the aid" of various regional militia.  *See* Verified Claim of Massachusetts ("Mass. Claim"), ¶ 4 & Ex 2 (Docket No. 14).[2]  The "enclosed" is Hamilton's Letter.  *See id.*  Citing the information in Hamilton's Letter, General Heath "begs" the Council to order "those raised in the Countys of Suffolk, Plymouth, Barnstable, and Bristol this way" to support the position of "our allies" in Rhode Island.

---

[1] During the Revolutionary War, the Council acted as the executive of Massachusetts.  As explained by former Chief Justice Hennessey of the Supreme Judicial Court, "on July 19, 1775, a Council of twenty-eight men was named by the House of Representatives, and this Council exercised the executive power until the inauguration of Governor John Hancock, under the Constitution of 1780, in October of 1780." Hennessey, Edward F., *The Extraordinary Massachusetts Constitution of 1780*, 14 SUFFOLK U. L. REV. 873, 879 (1980).

[2] The Massachusetts Claim is verified by Rebecca Murray, the Supervisor of Records for the Commonwealth.

Mass. Claim, Ex. 2.  General Heath further states that "the Marquis de Lafayette who came here the last evening is in sentiment with me."  *Id.*  The records of the Massachusetts Council indicate that the request was received on July 26, 1780, and "[i]n consequence of the Letters received this evening from General Heath advising of the movements of the British Troops," the Council authorized sending military reinforcements to Rhode Island.  Mass. Claim ¶ 4 & Ex. 3.

As original documents received by the government of Massachusetts during the Revolutionary War, from a Massachusetts General in the Continental Army, these records which pertain to wholly public matters—the Heath Letter, the Hamilton Letter, and the records of the Council—are public records of the Commonwealth, retained as part of its recordkeeping.  *See* Mass. Claim, ¶ 5.

On behalf of the Commonwealth, the Archives succeeded to and maintained possession and ownership of Massachusetts' public records, including the Letter.  *See* Mass. Claim, ¶ 6.  The Letter is—and has been—a public record of the Commonwealth since it was mailed to the Council in 1780 as evidenced by the following:

- The Archives included the Letter in an index of the collection that was compiled in the 1880s.  Mass. Claim ¶ 7 & Ex. 4.

- The internal table of contents and name index for Volume 202 of the Massachusetts Archives Collection identifies the letter as part of the collection in the mid-19th Century. *Id.* & Exs. 5, 6.  The table of contents references General Heath's letter to the Council and Letter, stating "Gen. William Heath to the Council in support of Rochambeau's request with a letter (382) from Alexander Hamilton."  *Id.* & Ex. 5.

- In the 1920s, select volumes of the Archives Collection were chosen for reproduction for their historical significance, and the Archives created a Photostat copy of the Letter, and reproduced and bound the copy within a facsimile of Volume 202.  *Id.* & Ex. 7.

- A transcription of the Letter appears in the 1961 edition of The Papers of Alexander Hamilton, Vol. II: 1779-1781, with an indication that it is "reproduced from a photostat of a missing original from the Massachusetts State Archives."  Attached at <u>Exhibit A</u>.

- A transcription of the Letter also appears on the website Founders Online, a resource created by the National Archives to make historical documents of the Founding Fathers available.  Mass. Claim ¶ 7 & Ex. 8.  The entry indicates that the Letter is missing from the Archives.  *Id.*

*See also* V. Compl., ¶¶ 5, 7, 8, 10-12; Massachusetts Answer ("Mass. Ans.") (Docket No. 18), ¶¶ 5, 7, 8, 10-12.

### 2. The Hamilton Letter and Other Historic Public Records Were Stolen from the Commonwealth of Massachusetts Archives.

As explained in the Commonwealth's Verified Claim, and alleged in the Verified Complaint, admitted by the Commonwealth and not denied by the Estate, the Letter was illegally stolen from the Archives section at the Massachusetts State House. *See* Mass. Claim, ¶ 8; V. Compl. ¶ 5; Mass. Ans. ¶ 5; Estate Answer ("Est. Ans.") ¶ 5 (Docket No. 16). The theft has been attributed to Harold E. Perry who was hired by the Archives as a cataloger in 1938. Mass. Claim, ¶ 8. Perry allegedly stole several rare documents from the Archives Collection at various times between 1938 and 1946, including items signed by George Washington, Benjamin Franklin, Paul Revere, Benedict Arnold, and Peter Stuyvesant. The thefts first came to light in March of 1950. *Id.* During the ensuing investigation, Perry admitted having stolen documents from the Archives. *Id.; see also* V. Compl., ¶¶ 5, 8, 9, 11; Mass. Ans., ¶¶ 5, 8, 9, 11.

Following detection of the thefts, and failed efforts to locate the documents among dealers in New England, then-Massachusetts Attorney General Francis E. Kelly circulated letters about the document thefts to police departments in New York, Philadelphia, and Chicago. Mass. Claim, ¶ 8 & Ex. 9. Several contemporaneous news articles detail the theft of historical documents from the Archives. Mass. Claim, ¶ 8 & Ex. 10.

### B. The Letter Was Consigned for Auction in December 2018 and Seized by the FBI.

On November 2, 2018, Stewart R. Crane, residing in South Carolina, through his agent and attorney, contracted with Potomack in Virginia, to consign the stolen Letter for auction, along with other documents from his collection. *See* Est. Ans. to Spec. Int. No. 3.[3] On or about November 15,

---

[3] On August 30, 2019, the United States propounded special interrogatories pursuant to Supplemental Rule G(6)(a) and (b) and Fed. R. Civ. P. 33. Rule G(6) provides for "special interrogatories

2018, Potomack received the stolen Letter, which had been transported by a moving company from South Carolina to Virginia. *See* V. Compl., ¶ 14, Est. Ans. ¶ 14.

As described in the Verified Complaint, a researcher at Potomack located a copy of the Letter on the Founders.com website (a resource created by the National Archives), and noted that the Letter was listed as "missing" from the Archives. *See* V. Compl., ¶ 16. Potomack contacted the Archives, which confirmed that the Letter had been stolen from its collection in or around the 1940s and supplied documentation about the theft. *Id.* Thereafter, Potomack contacted the FBI. *See id.*

Pursuant to a seizure warrant issued by the United States District Court for the Eastern District of Virginia, the FBI seized the stolen letter on December 19, 2018. The stolen Letter is in the custody of the FBI in Boston, Massachusetts, the jurisdiction from which it was stolen. V. Compl., ¶ 1. The United States alleged, and the Commonwealth admitted, that the Letter was illegally removed from the Archives. *See id.*; Mass. Ans., ¶ 1.

### C. The Estate's Untimely Claim and Special Interrogatory Answers.

Stewart R. Crane passed away on December 21, 2018. Est. Ans. to Spec. Int. No. 2. His estate filed a claim for the stolen Letter, asserting that it was the owner of record. Docket No. 15. In its Answer to the Verified Complaint, the Estate says that the letter "was purchased by R.E. Crane from Mr. Elmer Heise, and, upon Mr. Crane's death the Letter went to his heirs." Est. Ans., ¶ 17. In its Answers to Special Interrogatories, the Estate asserts, upon information and belief, that Raymond E. Crane, a resident of Pennsylvania, purchased the stolen Letter in 1945 from Elmer Heise of John Heise Autographs, a dealer in Syracuse, New York. *See* Est. Ans. to Spec. Int. No. 3. The Estate has no documentation memorializing this transaction. *See* Est. Ans. to Spec. Int. No. 5. The Estate claims

---

limited to the claimant's identity and relationship to the defendant property without the court's leave at any time after the claim is filed and before discovery is closed." The Estate served its answers and objections to the special interrogatories on September 27, 2019, attached hereto at Exhibit B ("Est. Ans. to Spec. Int."), but did include an attestation that the answers were made under oath. *See* Fed. R. Civ. P. 33.

that, upon his death in 1953, R.E. Crane passed the letter to his son Robert F. Crane, Sr., who later by *inter vivos* gift, gave the letter to Stewart R. Crane. *See* Est. Ans. to Spec. Int. No. 3. "An exact date of the gifts is not known/recollected." *See id.*

## III.    ARGUMENT

### A.  Standard of Review

Supplemental Rule G(8)(c)(i) provides that the United States may move to strike a claim or answer at any time before trial for failing to comply with Rule G(5) or (6) or "because the claimant lacks standing." Rule G further states that any such motion to strike must be decided "before any motion by the claimant to dismiss the action" and "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing standing by a preponderance of the evidence." Supplemental Rule G(8)(c)(ii) (A) and (B).

"Standing is a threshold consideration in all cases, including civil forfeiture cases." *United States v. One–Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 40 (1st Cir. 2003). The claimant has the burden to establish standing by a preponderance of the evidence. *See* Rule G(8)(c)(ii)(B); *see also United States v. $8,440,190.00 in U.S. Currency*, 719 F.3d 49, 57 (1st Cir. 2013).

Standing is comprised of statutory and constitutional aspects. Statutory standing requires that claimant satisfy the requirements of 18 U.S.C. § 983 and Supplemental Rule G. *See One-Sixth Share Of James J. Bulger*, 326 F.3d at 40-41. "As to constitutional standing, '[i]t is well established that a party seeking to challenge a forfeiture of property must first demonstrate an ownership or possessory interest in the seized property in order to have standing to contest the forfeiture.'" *Id.* at 41 (*quoting United States v. 116 Emerson St.*, 942 F.2d 74, 78 (1st Cir. 1991)). "In general, there are three components that must be satisfied for Article III standing: a concrete and particularized injury, a causal

connection between that injury and the wrongdoer's conduct, and the likelihood that prevailing in the action will rectify the injury in some way." *$8,440,190.00 in U.S. Currency*, 719 F.3d at 57 (citing *Antilles Cement Corp. v. Fortuño,* 670 F.3d 310, 317 (1st Cir. 2012)).

Although courts generally do not deny standing to a claimant that has a colorable ownership interest in the property at the early stages of litigation, it is axiomatic that a claimant, like the Estate, with no ownership interest in the property cannot have standing. *See id.* at 59 ("With no ownership interest in the [property], there is no possible way that [Claimant] can be injured by the forfeiture of the [property]."); *One-Sixth Share Of James J. Bulger*, 326 F.3d at 43-46 (claimant had no colorable interest in the property and no standing where title had been transferred to the United States five years before they obtained their purported lien); *United States v. $26,620.00 in U.S. Currency*, 2006 WL 949938, at *5 (N.D. Ga. Apr. 12, 2006) ("the claimant must come forth with some evidence of his ownership to establish standing to contest a forfeiture") (*citing United States v. $38,570 U.S. Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992)); *United States v. $746,198 in U.S. Currency, more or less*, 299 F. Supp. 2d 923, 927–28 (S.D. Iowa 2004) ("Article III standing in a forfeiture case 'turns on whether the claimant has a sufficient ownership interest in the property to create a case or controversy.'") (*quoting United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003)). Some evidence "supporting his assertion that he has a lawful [] interest in the [property] … is required for a valid claim." *United States v. $29,540.00 in U.S. Currency*, 2013 WL 783052, at *5 (D. Mass. Feb. 28, 2013); *see also United States v. United States Currency, $81,000*, 189 F.3d 28, 35 (1st Cir.1999).

The Estate cannot, as a matter of law, maintain an ownership interest in Letter. Therefore, the Estate does not have an injury that can be redressed, and its claim should be stricken.

**B. Ownership Interests Are Determined by State Law, and, Under State Law, the Estate Cannot Own the Stolen Letter, a Public Record.**

"In federal civil forfeiture proceedings, the definition of ownership interests is governed by state law." *One-Sixth Share Of James J. Bulger*, 326 F.3d at 45 (*citing U.S. Currency, $81,000*, 189

F.3d at 33); *United States Currency, $81,000.00*, 189 F.3d at 33 (State law "determines [claimant's] ownership interest ..., but federal law determines the effect of [the] ownership interest on his right to bring a claim.") (citations omitted); *One Lincoln Navigator 1998*, 328 F.3d at 1013 ("Ownership interests are defined by the law of the State in which the interest arose.").

Here, under state law, the Estate cannot have a colorable ownership interest in the stolen Letter because (1) it is a Massachusetts public record that only the Commonwealth can own; and (2) one cannot maintain good title to stolen property against its true owner.

1.   **Since at least 1897, Massachusetts Law Has Provided that *Only* the Commonwealth Can Own a Historic Massachusetts Public Record.**

The Estate makes the bald assertion that it is "the owner of record" of the stolen Letter, *see* Est. Claim (Docket No. 15), and "that it is the singular holder of any lawful interest in the Hamilton Letter." Est. Ans. to Spec. Int. No. 11.  The Estate is incorrect as a matter of law.

Regardless of whether the Letter was stolen from the Archives, it is not seriously disputed that the Letter was part of the collection of the Massachusetts Archives, and thus a public record of the Commonwealth.  Under state law, only the Commonwealth can own a public record.  *See* Mass. Gen. L. c. 66, § 8.  Thus, as a matter of law, the Estate cannot be "the owner of record" or have *any* lawful ownership interest in the Letter.

The requirement that Massachusetts public records be "safely preserved" dates to colonial times.  *See* Records of the Governor and the Company of Mass. Bay, Vol. 11 (1642-49) at 208 (attached at <u>Exhibit C</u>).  The obligation of the Secretary of the Commonwealth to keep public records has been enshrined in the Massachusetts Constitution since it became effective in October 1780. Mass. Const. Pt. 2, C. 2, § 4, art. II. From colonial times various laws addressing public records have been periodically enacted, and in 1897 the General Court enacted a comprehensive public records law.  *See* 1897 Mass. Acts, c. 439 (An Act Relative to Public Records) (the "1897 Act") (attached at <u>Exhibit D</u>).

Three provisions of the 1897 Act, which also appear in substantially the same form in the

current Public Records Act, are particularly significant here. First, the 1897 Act required that historic public records, records bearing a date earlier than 1800, be safely kept and prohibited their destruction.[4] Section 4 of the 1897 Act provided that: "Every original paper belonging to the files of the Commonwealth … bearing a date earlier than the year eighteen hundred … shall be safely kept …" Second, the 1897 Act required that those charged with lawful custody of public records must make efforts to recover records from anyone possessing them, and that the records shall be returned. Section 9 of the 1897 Public Records Act provided that: "Every person who is given by law the custody of any public records shall have the power to demand, and shall demand, any such public record from the person having the same in his possession, *and such person shall forthwith deliver such record to such custodian*." (Emphasis added.) And third, the 1897 Act contains penalties for those who wrongfully possess public records. Section 12 of the Public Records Act set forth penalties for any person "who unlawfully keeps in his possession a public record …, violates any of the provisions of this act, or alters, defaces, mutilates or destroys any public record."

Thus, by at least the date of the 1897 Act, the Letter was a public record that was required to be safely kept by the Commonwealth and, if removed, a person possessing the record was required under state law to return it and could be subject to penalties for unlawfully keeping a public record. It cannot be seriously disputed that in 1897, when the Public Records Act was passed, the Letter was a public record held by the Commonwealth: it was an original record kept in the files of the Commonwealth, bearing a date earlier than 1800. The Letter was referenced in the contemporaneous Massachusetts Council records of 1780 and was included in various indexes of documents held by the Commonwealth in the 19th century. *See* Mass. Claim, ¶¶ 4-7 & Exs. 2-7. And the Letter itself concerns wholly public matters—the conduct of the Revolutionary War—sent between officials

---

[4] Section Three of the 1897 Act also made clear that "[t]he secretary of the Commonwealth … shall have custody of all other public records of the Commonwealth … when no other disposition of such records is made by law or ordinance." *See also* Mass. Gen. L. c. 66, § 7.

acting in their official capacities.

The 1897 Act has been periodically amended, but these three provisions—that the Commonwealth is required to safely keep and preserve historic public records; that the lawful custodian of public records is required to demand the return of public records; and that they are required to be returned, and establishing penalties for anyone who unlawfully keeps a public record—have been Massachusetts law since at least 1897 and remain Massachusetts law today. *See, e.g.*, Mass. Gen. L. c. 66, §§ 8, 13, 15; *see also* 1901 Mass. Rev. L. c. 35, §§ 14, 20, 22 (attached at <u>Exhibit E</u>)[5]. Massachusetts has enacted no law that authorizes the alienation, deaccession or abandonment of historic public records such as the Letter. To the contrary, the Public Records Act was amended to protect *more* historic public records: current law requires Massachusetts to safely keep and preserve "[e]very original paper belonging to the files of the Commonwealth … bearing a date earlier than the year eighteen hundred and seventy." *See, e.g.*, Mass. Gen. L. c. 66, § 8.[6] Thus, Massachusetts law simply does not allow private ownership of the public records of Massachusetts, absent an act of the legislature, and places even more limitations on the treatment of historic public records dated before 1870. *See, e.g.*, Mass. Gen. L. c. 66, §§ 8, 13, 15.

The conclusion that only the Commonwealth can own its public records, including the Letter, is not only consistent with Massachusetts law, but is also how public records are treated throughout

---

[5] The Revised Laws of 1901 contains the language: "Every original paper belonging to the files of the Commonwealth … bearing date earlier than the year eighteen hundred … shall be *preserved* and safely kept … no such paper shall be destroyed without the written approval of the commissioner of public records." 1901 Mass. Rev. L. c. 35, § 14 (emphasis added).

[6] In 1939, "further penalty for the unlawful possession of any public record" was added to the law, namely, "imprisonment for not more than one year." Mass. St. 1939, c. 40 (attached at <u>Exhibit F</u>). In 1951, "An Act Making Express Provision for the Recovery of Unlawfully Detained Public Records" granted the superior court "jurisdiction in equity to compel any person unlawfully having such record in his possession to deliver the same to the complainant." Mass. St. 1951, c. 200 (attached at <u>Exhibit G</u>).

the country.[7]  *See* 66 Am. Jur. 2d Records and Recording Laws § 11 ("public records and documents are the property of the state and not of the individual who has them in his or her possession").

Courts have applied this rule to public records that later resurface for sale.  In a civil forfeiture case, a district court explained that "even if [claimant] purchased or otherwise possessed North Carolina's Original Copy of the Bill of Rights outright, this illegal possession did not dissolve the State of North Carolina's lawful possessory interest in the document, because 'there has never been a legally authorized means of selling, forfeiting or abandoning public documents of the State of North Carolina.'"  *United States v. N. Carolina's Original Copy of the Bill of Rights*, 2004 WL 3609349, at *3 (E.D.N.C. Feb. 19, 2004), *vacated and remanded sub nom. In re Matthews*, 395 F.3d 477 (4th Cir. 2005) (vacated based upon jurisdictional grounds due to dismissal of related action).  Similarly, in a case involving two colonial indictments issued in 1767 and 1768, bearing the signature of an original signer of the Declaration of Independence, the North Carolina Supreme Court affirmed that the documents were public records, and there being no showing that the State had intentionally abandoned the property, North Carolina was entitled to

---

[7] Several states address the ownership of public records as well as the problem of the theft and sale of historical public records on their websites.  The Texas State Library, for example, states that "Government records belong to the citizens of the communities that create or receive them. It is illegal for government records to be sold or alienated from public custody unless done in accordance with established, legal retention procedures."  *See* https://www.tsl.texas.gov/arc/sale.html ("Texas has lost hundreds of official historical government records from its public archives, particularly from the Colonial, Republic, and Early Statehood periods.").  The Tennessee Secretary of State's web page has a section devoted to "Recovering Lost or Stolen Property."  *See* https://sos.tn.gov/products/tsla/recovering-lost-or-stolen-public-records ("Public records are public property.  By law, some records must be maintained permanently by state and county governments.").  The New Jersey Department of State has a document recovery and amnesty program.  *See* https://www.nj.gov/state/archives/missingdocuments.html ("By law, the State of New Jersey retains ownership of any and all public records regardless of the circumstances of custody, alienation or provenance.").  And the Library of Virginia website proclaims "The Sale of Government Records Is Illegal!" *See* http://www.lva.virginia.gov/public/replevin.htm ("The sale of public records is an issue that has become problematic in recent years, as an increasing number of government records from federal, state, and local governments are being sold by private individuals and through online auctions, rather than remaining in the ownership of the public as ordained by law.").

the return of the indictments from an individual who had purchased them. *State of North Carolina v. West*, 235 S.E.2d 150, 157-58 (N.C. 1977). As explained by the Court of Appeals in that case,

> It is a well settled principle of law that title to government property may pass only in the manner prescribed by the duly constituted legislative body and that title to any such property may not be forfeited through the oversight, carelessness, negligence, or even intentional conduct of any of the agents of the government. *See U.S. v. Mallery*, 53 F.Supp. 564 (Wash. 1944). This legal principle applies to government land, personal property or public records. ***The underlying rationale of this rule is that property owned by the government is held in trust for the people and that the intentional or negligent acts of the agents of the government should not serve to deny the people of the benefits and enjoyment of 'their' property.*** *See Bartholomew v. Staheli*, 86 Cal. App. 2d 844 (1948).

*State of North Carolina v. West*, 229 S.E.2d 826, 831-32 (N.C. App. 1976) (emphasis added); *see also Middlesex Cty. v. Hamilton*, 1992 WL 12033509, *1-2 (Cir. Ct. of Va. June 29, 1992) ("[p]ublic records are the property of the state"; and "[o]ne who has no title to personal property can transfer none, nor does a good faith purchaser for value without notice acquire title against a rightful legal claimant," ordering public records be returned to the state).

The Estate cannot, as a matter of law, have an ownership interest in the Letter, a public record of the Commonwealth of Massachusetts, and thus lacks standing. With no lawful ownership interest in the Letter, "there is no possible way that [the Estate] can be injured by the forfeiture." *See $8,440,190.00 in U.S. Currency*, 719 F.3d at 59.

### 2. The Estate Cannot Own Stolen Property.

In its Answer, the Estate says that the Letter "was purchased by R.E. Crane from Mr. Elmer Heise, and, upon Mr. Crane's death, went to his heirs." Est. Ans,, ¶ 17. In its Answers to Special Interrogatories, the Estate says that "the legal right, title and interest of Stewart R. Crane (as successor to, and assignee of the R.E. Crane, a bona fide purchaser for value and without prior knowledge of facts or circumstances leading to forfeiture) in and to the Hamilton Letter is presently vested in Claimant." *See* Est. Ans. to Spec. Int. No. 3.

The Estate does not disagree that the Letter was stolen from the Archives.  *See* Oct. 4, 2019 Status Conf. Trans. at 8.  Indeed, the Estate claims that R.E. Crane obtained the letter in 1945, the same time period when the former Archives employee admitted to having stolen historical documents from the Archives,[8] which prompted the Massachusetts Attorney General to notify police departments across the country of the thefts.  *See* Mass. Claim, ¶ 8 & Exs. 9 & 10.  As noted, Massachusetts has enacted no law authorizing the alienation, deaccession or abandonment of public records like the Letter.

Assuming arguendo that the Estate could ever meet its burden to present admissible evidence regarding the circumstances of R.E. Crane's alleged purchase of the letter and his specific knowledge at the time, it is well-established that one cannot have good title to stolen property—and once a third party has knowledge of the theft, it is liable for failure to return the stolen property to its true owner.  As stated by the Massachusetts Supreme Judicial Court in 1869: "The principle is well settled, that, when a thief sells chattels, even to an honest purchaser, no title passes, and the owner may maintain an action for the property without a previous demand."  *Heckle v. Lurvey*, 101 Mass. 344, 345 (1869) (collecting cases).  Because "[a] purchaser of goods acquires all title which his transferor had or had power to transfer," *see* Mass. Gen. L. c. 106, § 2-403,[9] a subsequent buyer also generally cannot obtain good title to stolen property—it is irrelevant whether the subsequent purchaser was a bona fide purchaser for value.  *See Heckle*, 101 Mass. at 345; *see also Scollans v. Rollins*, 173 Mass. 275, 278 (1899) ("the real owner of [stolen property] in question is not devested [sic] by a sale to a purchaser in good faith and for value from one who has got them feloniously from the

---

[8] Documents stolen by the former Archives employee, and later recovered, had the Archives reference number—in this case 382—removed.  V. Compl., ¶ 11; Mass. Ans,, ¶ 11.  Although the Photostat copy of the Letter bears the number 382, the number 382 appears to have been removed from the Letter.  V. Compl., ¶¶ 10-11.

[9] This provision of the Uniform Commercial Code is a codification of the common law principle, *nemo dat quod non habet*, one cannot give what one does not have.  *See Mitchell v. Hawley*, 83 U.S. 544, 550 (1872).

true owner, nor by any subsequent dealing of such a purchaser with the [stolen property], but the property remains with the true owner, from whom they were feloniously taken.") (citing cases); *New Amsterdam Cas. Co. v. Goldstein*, 352 Mass. 492, 493–94 (1967) ("That the title of the original owner was not divested by the theft is elementary law. All he lost was possession. Thus he remained in paramount position to retake wherever he might find his property, or he could resort to legal remedies, an action for replevin being one."); *Gardner v. Beacon Tr. Co.*, 190 Mass. 27, 28 (1906) ("The general rule of law is, that where a person has obtained the property of another from one who is dealing with it without the authority of the true owner, no title is acquired as against that owner, even though full value be given, and the property be taken in the belief that an unquestionable title is being obtained.") (citation omitted).

Citing Massachusetts law, as well as other states' laws, a Delaware court succinctly stated:

> The general rule is well established that no one can transfer a better title to personal property or chattels than he himself has. When such property has been obtained unlawfully, as by theft, the one who became possessed of it under such circumstances can transfer no better title by sale than he has. Even a bona fide purchaser acquires no title to property which has been stolen. This same defect of title will continue to exist in all sales made subsequent to the theft, by persons whose title can be traced to that source.

*Farm Bureau Mut. Auto. Ins. Co. v. Moseley*, 90 A.2d 485, 488 (Del. Super. Ct. 1952) (*citing Heckle* and other cases). Massachusetts is not alone in providing that one cannot maintain good title to stolen goods against the true owner. For example, well-settled Virginia law similarly states: "one who does not have title to goods cannot transfer title to a buyer, even a bona fide purchaser for value without notice." *Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc.*, 506 S.E.2d 14, 16 (Va. 1998) (*citing First Nat'l Bank of Waynesboro v. Johnson*, 31 S.E.2d 581, 585 (Va. 1944)). So too, South Carolina courts, where the Estate is located, hold that "[b]ecause a person can pass to his successor no greater title than he acquired, a thief *or one in the subsequent chain of title cannot grant good title to stolen property*, even to a bona fide purchaser." *Motors*

*Ins. Corp. v. State of South Carolina*, 437 S.E.2d 555, 557 (S.C. Ct. App. 1993) (citing *Marvin v. Connelly*, 252 S.E.2d 562 (S.C. 1979)) (emphasis added).

Thus, no matter how (or where) the Estate obtained the *stolen* Letter, as a matter of law, it cannot maintain ownership to it, particularly when faced with a demand for its return from the Commonwealth, its true owner. This settled principle has been applied in numerous cases involving stolen property. For example, in an interpleader action regarding a painting by Renoir that had been stolen from the Baltimore Museum of Art in 1951, but resurfaced for auction in 2002, the court ruled that the claimant, a subsequent bona fide purchaser, "cannot have good title as the possessor of a stolen work of art." *In re Paysage Bords De Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*, 991 F. Supp. 2d 740, 744-45 (E.D. Va. 2014) (noting claimant "ultimately fails to offer a scintilla of evidence that the Painting was not stolen"). Similarly, in a case involving the recovery of a Tiffany Sword stolen from Brown University in the 1970s that resurfaced twenty years later, the district court held that "[b]ecause the Tiffany Sword was stolen from Brown, no owner subsequent to the thief obtained title superior to Brown's. Accordingly, although Tharpe may have purchased the Sword for value in good faith, he did not obtain good title to it." *Brown Univ. v. Tharpe*, 2013 WL 2446527, at *11 (E.D. Va. June 5, 2013); *see also United States v. Barnard*, 72 F. Supp. 531, 532-33 (W.D. Tenn. 1947) ("Since this gold piece was stolen … from the Philadelphia Mint, the defendant, as the purchaser, took the same subject to the defects in its title and this is true, even though the property was acquired in good faith, for a valuable consideration and without notice of any infirmity of title. *He cannot maintain ownership in such property against one who has been deprived of it by theft or other illegal act. This principle of law is so well settled that it is only necessary to cite a few cases*.") (emphasis added) (citing cases).

**C. In a Civil Forfeiture Action, No One May Assert an Ownership Interest in Property "That Is Illegal to Possess," Such as the Letter.**

Even if the Estate were able to establish some injury sufficient to confer constitutional standing, the Estate also cannot establish standing under the applicable civil forfeiture statute, 18 U.S.C. § 983. Section 983 defines "owner" as "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." 18 U.S.C. § 983(d)(6)(A). Pursuant to state law, as discussed *supra*, the Estate cannot be an owner of the Letter. *See, e.g., $8,440,190.00 in U.S. Currency*, 719 F.3d at 59; *One-Sixth Share Of James J. Bulger*, 326 F.3d at 45. The statute further provides that "no person may assert an ownership interest under this subsection in contraband or other property that it is illegal to possess." 18 U.S.C. § 983(d)(4). Plainly, the Letter also falls under Section 983(d)(4)'s ban on claims to property that is illegal to possess.

Massachusetts law requires that one who possesses a Massachusetts public record return it upon the demand of the Commonwealth. The failure to do so is unlawful and subjects one to penalties, including imprisonment. Mass. Gen. L. c. 66, §§ 13, 15 (requiring the turnover of public records and establishing penalties for anyone "who unlawfully keeps in his possession a public record …, violates any of the provisions of this act").

The possession of stolen or unlawfully converted property is similarly illegal. One who possesses stolen property does not have good title, is subject to recovery actions (as discussed above) and, in certain circumstances, criminal liability under federal and state law. Indeed, 18 U.S.C. § 2315 specifically provides that "[w]hoever receives, *possesses*, conceals, stores, barters, sells, or disposes of *any goods*, wares, or merchandise, securities, or money of the value of $5,000 or more, ... which have crossed a State or United States boundary after being *stolen, unlawfully converted, or taken*, knowing the same to have been stolen, unlawfully converted, or taken," shall be subject to criminal penalties); *see also* 18 U.S.C. § 2314; Mass. Gen. L. c. 266, § 60.

For 18 U.S.C. § 983(d)(4) to apply there is no requirement that the property be per se illegal

to possess or subject a person to criminal penalties. "Illegal to possess" includes property that "becomes illegal to possess because of extrinsic circumstances." *United States v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1135 (9th Cir. 2005) (holding that claimant could not raise innocent owner defense with regard to seized king crab). "[I]t is sufficient to determine that 'property that it is illegal to possess' includes items that may be legally possessed in some circumstances but that become illegal to possess in others." *Id. see also United States v. 1866.75 Bd. Feet & 11 Doors & Casings, More or Less, of Dipteryx Panamensis Imported from Nicaragua*, 587 F. Supp. 2d 740, 751 (E.D. Va. 2008), *aff'd sub nom. United States v. Thompson*, 332 F. App'x 882 (4th Cir. 2009) (wood that was exported to the United States in contravention of some laws, but could be lawfully imported in certain circumstances, was "illegal to possess" and the innocent owner defense was barred); *United States v. Approximately 236 Firearms and 11,376 Rounds of Ammunition*, 2014 WL 12575724, *4 (S.D. Iowa Apr. 28, 2014) (claimants, two gun shops owned by a felon, cannot obtain a federal firearms license and cannot legally be an owner; "with respect to Claimants, Defendant Property is 'property that it is illegal to possess, and [they] are thus precluded from asserting an innocent owner defense under 18 U.S.C. § 983(d)").

A case involving the civil forfeiture of illegally imported lottery tickets is instructive. Because the tickets were not allowed to be brought into the United States, and thus illegal to possess under 18 U.S.C. § 983(d)(4), the court granted the government's motion to strike the claim for lack of standing. *United States v. $75,000 in U.S. Currency*, 97 F. Supp. 3d 1, 3 (D.P.R. 2015). The district court held that the claimant "cannot demonstrate an ownership interest in the seized property." *Id.* It reasoned that because the lottery tickets were "illegal to possess," a cognizable property interest never materialized, and thus claimant lacked standing. *Id.* (citing *United States v. Two Mitsubishi Pick-up Trucks*, 396 F. Supp. 2d 117, 121 (D.P.R. 2005) and *United States v.*

*Approximately 600 Sacks of Green Coffee Beans*, 381 F. Supp. 2d 57, 62 (D.P.R. 2005) (coffee beans illegally imported into Puerto Rico were contraband and subject to forfeiture.)).

Because the Estate cannot be an owner of the property, and further, because the Letter is property that is illegal to possess as both a public record belonging to the Commonwealth and stolen property, the Estate has no cognizable interest in the Letter under the civil forfeiture statute and lacks standing.

### D. The Estate's Claim Is Untimely.

Although the Court extended the time for certain potential claimants to file claims (Ann-Stewart Boss and the Estate of R.E. Crane), no such extension was requested or granted for the Estate or Aldrich L. Boss. Supplemental Rule G Provides that the government may move to strike a claim "for failing to comply with Rule G(5) or (6)." *See* Supplemental Rule G(8)(c)(i). Rule G(5) provides that a claimant's claim must be timely filed. Claimants and potential claimants are not theoretical or fungible—each potential claimant must possess actual standing to litigate this action. Neither the Claimant, the Estate, nor Aldrich Boss, nor the non-claimants Anne-Stewart Boss nor the Estate of R.E. Crane have such standing because none filed a timely claim.

Here, the Claim is made on behalf of the Estate of Stewart R. Crane, by its personal representative Aldrich L. Boss. *See* Docket No. 15. The United States filed a declaration of service by publication on July 17, 2019, indicating that the last publication date was June 16, 2019. *See* Docket No. 10. The deadline for the Estate to file a claim was July 16, 2019, sixty days from the first date of publication. *See* Supplemental Rule G(5). That deadline was never extended. Nevertheless, the Estate filed its Claim on August 25, 2019, forty days after the last possible deadline for doing so.

In contrast, the deadline for the Archives, non-claimant Estate of R.E. Crane and non-claimant Anne-Stewart Boss to file claims was twice extended by order of the Court. *See* Docket Nos. 7, 8, 11, 12. On July 22, 2019, the United States, the Commonwealth Archives, and non-claimant Ann-Stewart

Boss, non-claimant Estate of R.E. Crane filed a joint motion for a second extension of time. Docket No. 11. The joint motion, signed by all counsel, provided that the United States, "the Massachusetts State Archives, Ann-Stewart Boss, and the Estate of R.E. Crane (the 'Interested Parties') jointly request an additional thirty-one (31) day extension, up to and including August 26, 2019, for the Massachusetts State Archives, Ann-Stewart Boss and/or the Estate of R.E. Crane—*and only these Interested Parties*—to file a claim in the above-captioned matter." *See id.* (emphasis added). The joint motion was granted on July 23, 2019. Docket No. 12. No other extensions were requested by any party or ordered by the Court.

Although the docket entries indicates that a claim and answer was filed by Ann-Stewart Boss and the Estate of R.E. Crane, *see* Docket Nos. 15, 16, neither putative claimant filed a claim nor did they sign that claim that was filed. The claim that was filed is signed by Aldrich L. Boss for the Estate of Stewart R. Crane, neither of whom received an extension to August 26, 2019 to file a claim.

<u>Conclusion</u>

For the foregoing reasons, the United States of America respectfully requests that the Court grant its motion and strike the claim of Claimant Aldrich L. Boss, as Personal Representative for the Estate of Stewart R. Crane, with prejudice.

Respectfully submitted,

ANDREW E. LELLING,
United States Attorney,

By:     */s/ Carol E. Head*
CAROL E. HEAD, BBO No. 652170
Assistant United States Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100
carol.head@usdoj.gov

November 5, 2019

## CERTIFICATE OF SERIVCE

I hereby certify that the foregoing document, was filed through the Electronic Case Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

*/s/ Carol E. Head*
CAROL E. HEAD

Dated: November 5, 2019                   Assistant United States Attorney