UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br><br>        v.<br><br>LETTER FROM ALEXANDER HAMILTON<br>TO THE MARQUIS DE LAFAYETTE DATED<br>JULY 21, 1780<br>        Defendant.<br><br>_____<br><br>ALDRICH L. BOSS, as Personal Representative for<br>The ESTATE OF STEWART R. CRANE,<br><br>and<br><br>COMMONWEALTH OF MASSACHUSETTS,<br>acting by and through THE MASSACHUSETTS<br>ARCHIVES,<br><br>        Claimants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION<br>NO. 19-cv-11121-JGD |

**MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION TO STRIKE THE CLAIM OF CLAIMANT ALDRICH L. BOSS AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF STEWART R. CRANE AND CLAIMANT BOSS' MOTION TO DISMISS THE PLAINTIFF'S VERIFIED COMPLAINT**

October 28, 2020

DEIN, U.S.M.J.

## I. **INTRODUCTION**

This civil forfeiture case concerns an ownership dispute over a letter dated July 21, 1780

from Alexander Hamilton to the Marquis de Lafayette (the "Letter") notifying Lafayette of

British troop movements in Rhode Island.  The United States of America brings this action for

civil forfeiture of the Letter, pursuant to 18 U.S.C. § 981(a)(1)(C).  The United States contends that the Letter is a public record belonging to the Commonwealth of Massachusetts (the "Commonwealth") that was stolen from the Commonwealth of Massachusetts Archives ("the Archives") at some point between 1938 and 1946.  It was allegedly purchased by R.E. Crane in around 1945, and resurfaced in 2018, when Crane's heirs sought to sell it at auction.  The Letter was seized by, and remains in the possession of, the Federal Bureau of Investigation (the "FBI") in Boston, Massachusetts.

The United States alleges that the Letter is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that the Letter is property which is derived from proceeds traceable to the interstate transportation of stolen property, which is prohibited by 18 U.S.C. §§ 2314 and 2315.  (See Docket No. 1, Verified Complaint for Forfeiture *in Rem* (the "Complaint") ¶¶ 19-22).  The Estate of Stewart R. Crane, by and through its personal representative, Aldrich L. Boss, ("the Estate"), filed a claim asserting an ownership interest in the Letter, pursuant to Rule (G)(5)(a)(i) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  (See Docket No. 15, the "Estate Claim").  The Commonwealth of Massachusetts also filed a verified claim alleging an ownership interest in the Letter.  (See Docket No. 14, the "Commonwealth Claim").

This matter is before the Court on the *United States' Motion to Strike the Claim of the Claimant Aldrich L. Boss as Personal Representative for the Estate of Stewart R. Crane* (Docket No. 24) and memorandum of law in support thereof (Docket No. 25, the "USA Mem."), and the Estate's *Cross-Motion to Dismiss the Plaintiff United States of America's Verified Complaint for Forfeiture* in Rem*, Dated May 15, 2019* (Docket No. 28) and memorandum of law in support

thereof and in opposition to the USA Motion to Strike (Docket No. 29, the "Estate Mem.").  The

Commonwealth has also filed a memorandum of law in support of the USA's Motion to Strike

and in opposition to the Estate's Motion to Dismiss.  (Docket No. 34, the "Commonwealth

Mem.").  For the reasons detailed herein, the USA's Motion to Strike (Docket No. 24) is

ALLOWED and the Estate's Motion to Dismiss (Docket No. 28), is DENIED as moot.

## II.  FACTUAL BACKGROUND

### The Letter

The following facts are drawn from the Complaint and the parties' submissions and are

undisputed unless otherwise noted.[1]  The property in dispute is a letter penned by Alexander

Hamilton on July 21, 1780 during the Revolutionary War.  (Complaint ¶ 1).  The Letter was

addressed to Lafayette and relayed information concerning British troop movement that could

"menace the French fleet and army" in Rhode Island.  (USA Mem. at 3).  Massachusetts General

William Heath forwarded the Letter to the President of the Council for the State of

Massachusetts, enclosing with it a letter of his own dated July 25, 1780, and asking the Council

to send troops to support the French allies in Rhode Island.  (Id.; see also Commonwealth Claim

¶ 4).  According to the records of the Massachusetts Council, the request for aid was received

on July 26, 1780, and prompted the Council to send military reinforcements to Rhode Island.

(Commonwealth Claim ¶ 4).  The Commonwealth asserts that "[a]s items from a Massachusetts

---

[1] The factual record has been fully developed in this case through answers to the Complaint filed by the Estate (Dkt. No. 16) and the Commonwealth (Dkt. No. 18), the Claims filed by the Estate (Dkt. No. 15) and the Commonwealth (Dkt. No. 14), and the answers to special interrogatories by the Estate (USA Mem., Ex. B).  While the Estate has stated that it would be interested in taking additional discovery, it has not indicated in any way what additional information would be helpful to understand the historic events at issue in this dispute, or otherwise alter the standing analysis. (See Docket No. 36, Transcript of February 26, 2020 Oral Argument (Docket No. 36) at 26:5 – 28:21).

General in the Continental Army directed to the Massachusetts Counsel, General Heath's

correspondence and the enclosed [Letter] were duly received and retained by an administrative

division of the Massachusetts government in the normal course of its recordkeeping." (Id.).

### Custody of the Letter

The Letter was apparently in the custody of the Archives as early as 1880, as evidenced

by an index of the Archives' collection during that time. (USA Mem. at 4). The Letter also

appeared on the table of contents and attendant name index for Volume 202 of the

Massachusetts Archives Collection (SC1/Series 45x), which listed materials contained in the

Archives Collection in the mid-19th century. (Commonwealth Claim ¶ 7(b)). It is also

undisputed that the Letter remained in the Archives' possession until at least the 1920's when

the Letter was "chosen for reproduction on the basis of [its] historical significance and use" and

a photostat copy of the Letter was created and bound within a facsimile of Volume 202 of the

Archives' collection. (USA Mem. at 4; see also Commonwealth Claim ¶ 7(c)). All parties agree

that sometime following the creation of the photostat copy, the Letter left the possession of

the Archives.

The United States alleges that the Letter, along with other historical documents, were

stolen from the Archives between 1937 and 1945 by a former employee. (Complaint ¶ 5). The

United States claims that a former Archives employee, who was arrested in 1950, sold various

stolen items, including the Letter, to rare document dealers throughout the country. (Id. ¶ 9).

On February 27, 1950, the then-Attorney General of Massachusetts sent letters to the New

York, Philadelphia, and Chicago police departments alerting them of the theft of the stolen

documents and listing "some of the more important and valuable documents" that were

compromised.  (Commonwealth Claim ¶ 8).  The Letter was not specifically named in this correspondence.  (Estate Mem. at 5).  The thefts were also reported in newspapers both locally and nationally, although, again, the Letter was not specifically referenced among the items listed as stolen.  (Commonwealth Claim ¶ 8; Estate Mem. at 5).

The Estate questions whether the Letter was stolen, and instead suggests, without factual support, that the United States and the Commonwealth have "invent[ed] a theft" in order to "cover-up the incompetent management" of the Archives.  (Estate Mem. at 1-2).  The Estate alleges that R.E. Crane, grandfather of Stewart Crane, purchased the Letter from a reputable rare documents dealer, John Heise Autographs, in Syracuse, New York, in or around 1945.  (Id. at 6).  The only evidence of this purchase is a post-marked envelope from John Heise Autographs, which the Estate claims contained the Letter which was sent to R.E. Crane in Pennsylvania following his purchase.  (Id.).  The United States and the Commonwealth challenge the sufficiency of this proof.  The Estate contends further that upon R.E. Crane's death, the Letter was transferred to his son, Robert F. Crane, Sr., who in turn, conveyed the Letter to his son, Stewart Crane, whose Estate held the Letter until it was seized by the FBI in 2018.  (Id. at 7).

Following Stewart Crane's death in 2018, his family contracted with an auction house to sell the Letter along with other historical documents.  (Estate Mem. at 7).  A researcher at the auction house located a copy of the Letter on the archival website, Founders Online, which listed the Letter as "missing" from the Archives.  (Complaint ¶¶ 12, 16).[2]  The auction house

---

[2] The listing can be found at https://founders.archives.gov/documents/Hamilton/01-02-02-0775.  This is a resource created by the National Archives that makes available historical documents of the Founders

then contacted the Archives, and the Archives confirmed that the Letter was stolen from its

collection.  (Id.).  Upon this discovery, the auction house contacted the FBI, and the Letter was

seized shortly thereafter.  (Id.; see also Estate Mem. at 7).

Additional facts will be provided below as appropriate.

### III.  ANALYSIS

### A.  Overview of the Standing Requirement

The United States seeks to strike the Estate's claim to the Letter on the grounds that the

Estate lacks standing to intervene in this action.  "Standing is a threshold consideration in all

cases, including civil forfeiture cases."  U.S. v. One-Sixth Share of James J. Bulger In All Present

& Future Proceeds of Mass Millions Lottery Ticket No. M246233, 326 F.3d 36, 40 (1st Cir. 2003).

"In forfeiture cases, the property is the defendant and therefore defenses against forfeiture can

only be brought by a third-party intervenor . . . who generally must have independent

standing."  U.S. v. $8,440,190.00 in U.S. Currency, 719 F.3d 49, 57 (1st Cir. 2013) (citing One-

Sixth Share of James J. Bulger, 326 F.3d at 40).  "By virtue of the roots of in rem jurisdiction in

admiralty law, the procedures for intervention in civil forfeitures are governed by the

Supplemental Rules of Certain Admiralty and Maritime Claims."  One-Sixth Share of James J.

Bulger, 326 F.3d at 40-41 (citing 18 U.S.C. § 981(b)(2) (1994) (amended 2000)); see also U.S. v.

$80,020.00 in U.S. Currency, 57 F. Supp. 3d 143, 145 (D.P.R. 2014) (noting Rule G governs

forfeiture actions in rem under federal statutes such as 18 U.S.C. § 981).  Supplemental Rule

---

of the United States.  (See Commonwealth Claim ¶ 7d, Ex. 8).  There is no information in the record as to
when or how the Letter was reported as "missing" by the archival website.

G(8)(c)(i) provides that the United States may move to strike a claim or answer at any time before trial for failing to comply with Rule G(5) or (6) or "because the claimant lacks standing."

"When faced with a motion seeking to strike a claim . . . the burden is on the party contesting the forfeiture (the claimant) to establish standing by a preponderance of the evidence." $8,440,190.00 in U.S. Currency, 719 F.3d at 57.  Supplemental Rule G further provides that such a motion to strike must be decided "before any motion by the claimant to dismiss the action" and "may be presented as a motion for judgment on the pleadings or as a motion to determine after a hearing or by summary judgment whether the claimant can carry the burden of establishing by a preponderance of the evidence."  Supplemental Rule G(8)(c)(ii)(A) and (B).  Thus, only a claimant who establishes standing may move to dismiss the action.  See id. at G(8)(b)(i).

Applying these principles, the analysis in the instant case begins with a determination of whether the Estate has established standing to survive the USA Motion to Strike.  For the reasons explained below, the Estate does not have standing because it cannot assert an ownership interest in the Letter as a matter of law.

### B.  Standard of Review: Standing

"Enacted in 2000, the Civil Asset Forfeiture Reform Act ("CAFRA") sets forth the procedures used in all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in [the statute]."  U.S. v. 144,774 pounds of Blue King Crab, 410 F.3d 1131, 1134 (9th Cir. 2005).  To intervene in a civil forfeiture case, a third-party claimant must establish both statutory and constitutional standing.  See One-Sixth Share of James J. Bulger, 326 F.3d at 40 (citing U.S. v. Cambio Exacto, S.A., 166 F.3d 522, 526 (2d Cir. 1999)).  Statutory

standing is satisfied when the claimant meets the procedural requirements of Rule G(5).  See

$80,020.00 in U.S. Currency, 57 F. Supp. 3d at 146.  As such, a claimant who files an untimely

claim does not have standing to contest the forfeiture.  See U.S. v. One Dairy Farm, 918 F.2d

310, 311 (1st Cir. 1990) (concluding claimants lacked standing because they failed to file timely

claim or answer).  This court concludes that the Estate has established that it has statutory

standing, and that requirement will not be discussed further.[3]

Constitutional standing requires a party to show they have suffered a "concrete and

particularized" injury, that the injury was caused by the wrongdoer's conduct, and that a

favorable court decision will redress the injury.  See $8,440,190.00 in U.S. Currency, 719 F.3d at

57.  To establish constitutional standing in the context of a civil forfeiture action, the "'party

seeking to challenge a forfeiture of property must first demonstrate an ownership or

possessory interest in the seized property'" such that the claimant has suffered a concrete

injury by the forfeiture that can be rectified by a favorable decision.  One-Sixth Share of James

J. Bulger,, 326 F.3d at 41 (quoting U.S. v. 116 Emerson St., 942 F.2d 74, 78 (1st Cir. 1991)); see

---

[3] The United States argues that the Estate filed an untimely response, and therefore lacks standing to bring a claim.  (See USA Mem. at 19-20).  However, the Estate contends that the United States failed to give notice to the correct Estate, and that it filed its claim prior to the extended deadline granted by the United States to other claimants who were related to the Estate.  (See Dkt. No. 12, extending deadline to file claims for the Commonwealth, Ann-Stewart Boss and/or the Estate of R.E. Crane).  Furthermore, the Estate filed a timely answer containing all of the information required in the claim and the United States was already in discussions with members of the Estate's family to extend the deadline for filing claims.  Therefore, if the Estate's claim was untimely, it caused no prejudice to the United States or the Commonwealth.  Accordingly, the Court will exercise its discretion to treat the Estate's claim as timely. See U.S. v. One Urban Lot Located at 1 Street A-1, Valparaiso, Bayamon, Puerto Rico, 885 F.2d 994, 999 (1st Cir. 1989) ("So that to the greatest extent possible controversies are decided on the merits, a district judge should exercise his discretion to grant additional time for the filing of a claim when the goals underlying the time restrictions and the verification [of the claim] are not thwarted." (internal quotation and citation omitted)).

also U.S. v. U.S. Currency, $81,000.00, 189 F.3d 28, 35 (1st Cir. 1999) (an owner of seized

property "necessarily suffers an injury" that can be redressed by returning the property).

The First Circuit has characterized this standing requirement as "forgiving," such that

"any colorable claim on the defendant property" will suffice.  See One-Sixth Share of James J.

Bulger, 326 F.3d at 41.  See also $8,440,190.00 in U.S. Currency, 719 F.3d at 57-58 ("At the

initial stages of intervention, the requirements [to establish an ownership or possessory

interest in the seized property] are not arduous and typically any colorable claim on the

defendant property suffices." (internal quotation omitted)).  The claimant "need not prove the

full merits of her underlying claim" in order to establish an ownership interest for the purposes

of standing.  See U.S. v. One Parcel of Real Prop. With Bldgs., Appurtenances and Improvements

Known as 116 Emerson St., Located in City of Providence, R.I., 942 F.2d 74, 78 (1st Cir. 1991)

(affirming district court's holding that because claimant "raise[d] questions about the possibility

of an equitable interest in the property [seized]" she was entitled to "the opportunity to prove

her claim at trial," even though the basis of her claim was later held to be improper).  "An

allegation of ownership, coupled with some evidence of ownership, is sufficient to establish

constitutional standing to contest a forfeiture."  $8,440,190.00 in U.S. Currency, 719 F.3d at 58

(citation omitted).  Nevertheless, claims of claimants who cannot establish an ownership

interest as a matter of law are subject to dismissal because, without an ownership interest,

"there is no possible way" that a claimant is injured by the forfeiture.  Id. at 59.

In a civil forfeiture action, state law governs the claimant's ownership interest in the

property.  See One-Sixth Share of James J. Bulger, 326 F.3d at 45; see also U.S. Currency,

$81,000.00, 189 F.3d at 33 (state law determines a claimant's ownership interest while federal

law determines the effect of that ownership interest).  Accordingly, we look to Massachusetts

law to determine the Estate's ownership interest in the Letter.[4]

### C. **The Letter Is A Public Record Under Massachusetts Law**

The parties dispute, in the first instance, whether, under Massachusetts law, the Letter

is a "public record" and, if it is, whether individuals or entities other than the Commonwealth

may own a public record.  (See USA Mem. at 8-9; Estate Mem. at 11-14).  Where, as here, the

relevant facts are undisputed, these issues raise questions of law which can be decided by the

court.  See Burton v. Town of Littleton, 426 F.3d 9, 17 (1st Cir. 2005) (concluding that a

termination letter forwarded to the Massachusetts Commissioner of Education was not a public

record under Massachusetts law as a matter of law); U.S. v. $75,000 in U.S. Currency, 97 F.

Supp. 3d 1, 3-4 (D.P.R. 2015) (where lottery tickets could not be brought into United States as a

matter of law, claimant could not establish an ownership interest and lacked standing to

challenge forfeiture of lottery proceeds);  Dunn v. Bd. of Assessors of Sterling, 361 Mass. 692,

693, 282 N.E.2d 385, 387 (1972) (concluding field record cards from property appraisals were

not public records pursuant to Mass. Gen. Laws ch. 4, § 7 as a matter of law).  For the reasons

detailed herein, this court concludes that the Letter is a public record.  As detailed in the next

section, this court further concludes that the Commonwealth is the only entity that can own

the Letter.  Therefore, the United States has met its burden of establishing, "by a

---

[4] Although the Estate argued in its brief that it was "not clear" that Massachusetts law applied to this case, it conceded at oral argument that Massachusetts law controls the issue of who owns the Letter. (See Transcript of February 26, 2020 Oral Argument at 47:22 – 48:04).

preponderance of the evidence, that the property is subject to forfeiture."  18 U.S.C. §

983(c)(1).

### Statutory Definitions of a Public Record

It is well-established that all questions of statutory interpretation "begin with the

language of the statute."  U.S. Bank Trust, N.A. v. Johnson, 96 Mass. App. Ct. 291, 294, 134

N.E.3d 594, 597 (2019).  Moreover, statutes must be read "as a whole to produce an internal

consistency" with the "overarching objective" to be "to discern the intent of the Legislature,

based on the words used and the evident purpose for which the statute was enacted."  Id. at

295, 134 N.E.3d at 597-98 (internal punctuation and citations omitted). See also City Electric

Supply Co. v. Arch Ins. Co., 481 Mass. 784, 788, 119 N.E.3d 735, 740 (2019) ("Where the

language of a statue is plain and unambiguous, it is conclusive of the Legislature's purpose.")

(internal punctuation and quotation omitted).   Similarly, "all the pertinent statutes relating to

the same subject matter should be considered as a whole and, if possible, be so construed as to

make them effectual pieces of legislation in harmony with common sense and sound reason."

Hardman v. Collector of Taxes of North Adams, 317 Mass. 439, 442, 58 N.E.2d 845, 846 (1945)

(internal quotation and citation omitted) (interpreting public record laws).  The relevant

statutes compel the conclusion that the original document at issue here is an historic public

record.

"Public records" are "broadly defined" under current Massachusetts law, see Attorney

General v. District Attorney for Plymouth District, 484 Mass. 260, 263, 141 N.E.3d 429, 432-33

(2020), and have been since the first public records law was enacted in 1897.  Unless expressly

exempted, they "include all documentary materials made or received by an officer or employee

of any corporation or public entity of the Commonwealth[.]"  <u>Wakefield Teachers Ass'n v.</u>

<u>School Committee of Wakefield</u>, 431 Mass. 792, 796, 731 N.E.2d 63, 66 (2000) (internal

quotation and citation omitted).  As detailed herein, the Letter meets the definition of a "public

record."

The first comprehensive Public Records Act was enacted in Massachusetts in 1897.  <u>See</u>

1897 Mass. Acts, c. 439 (An Act Relative to Public Records) (the "1897 Act").  (USA Mem. at Ex.

D).  The 1897 Act designates who shall have custody of all public records, and provides that

"[t]he secretary of the Commonwealth . . . shall have custody of all other public records of the

Commonwealth . . . when no disposition of such records is made by law or ordinance."  1897

Act at Section 3.  The words "public records" are defined to mean:

> Any written or printed book or paper, or any map or plan of the Commonwealth or of
> any county, city or town, in or on which any record or entry has been or is to be made in
> pursuance of any requirement of law, or any written or printed book or paper, or any
> map or plan which any officer or employee of the Commonwealth or of any county, city
> or town is required by law to receive, or in pursuance of any such requirement has
> received for filing, **and any book, paper, record or copy mentioned in either of the five
> following sections.** . . .

1897 Act at Section 1 (emphasis added).  The "following" Section Four mentions "[e]very

original paper belonging to the files of the Commonwealth or of any county, city or town,

bearing a date earlier than the year eighteen hundred" and provides that they shall be "safely

kept."  1897 Act at Section 4.  The Letter is dated prior to 1800, and is an original document.  It

"belonged to the files of the Commonwealth" as evidenced by the fact that it was delivered to

the President of the Council for the State of Massachusetts as an attachment to a letter from

Massachusetts General William Heath, at which time it was "retained by an administrative

division of the Massachusetts government in the normal course of its record keeping" and

[12]

thereafter stored in the Archives of Massachusetts.  (See Commonwealth Claim ¶¶ 4-5). The

Letter clearly constitutes a public record under the 1897 Act.

The Letter qualifies as a public record under modern Massachusetts statutes as well.

For example, Mass. Gen. Laws ch. 4, § 7, clause Twenty-sixth, provides that in construing

statutes, "public records"

> **shall mean all books, papers,** maps, photographs, recorded tapes, financial statements,
> statistical tabulations, **or other documentary materials or data, regardless of physical
> form or characteristics, made or received by any officer or employee of any agency,
> executive office,** department, board, commission, bureau, **division or authority of the
> commonwealth, or of any political subdivision thereof, or of any authority established
> by the general court to serve a public purpose**, or any person, corporation, association,
> partnership or other legal entity which receives or expends public funds for the payment
> or administration of pensions for any current or former employees of the
> commonwealth or any political subdivision as defined in section 1 of chapter 32, **unless
> such materials or data fall within the following exemptions . . . .**

(Emphasis added).  None of the exemptions have any application to the instant case.  See Mass.

Gen. Laws ch. 4, § 7, clause Twenty-sixth (a)-(u).  The Letter clearly fits within the "broad"

definition of "public records" since it is a paper "made or received by any officer or employee of

any Massachusetts governmental entity."  Attorney Gen. v. District Attorney for Plymouth

District, 484 Mass. 260, 263, 141 N.E.3d 429, 432-33 (2020) (internal punctuation omitted),

citing Mass. Gen. Laws ch. 4, § 7.  See also Mass. Gen. Laws ch. 30, § 42 (defining "record"

broadly in the context of the powers of the Commonwealth's records conservation board).

Similarly, modern Massachusetts statutes require that original historical documents

such as the Letter must be safely kept by the Commonwealth.  Like the 1897 Act, the current

Public Records Act, Mass. Gen. Laws ch. 66, §§ 1 et seq. designates which governmental entity

is responsible for maintaining specific public records, and provides that the "state secretary"

shall "have the custody of all other public records of the commonwealth . . .  if no other

disposition of such records is made by law or ordinance[.]"  Mass. Gen. Laws ch. 66, § 7.

Pursuant to Mass. Gen. Laws ch. 66, § 8, "[e]very original paper belonging to the files of the

commonwealth or of any county, city or town, bearing date earlier than the year eighteen

hundred and seventy . . . shall be preserved and safely kept[.]"  Again, the original 1780 Letter,

which belonged to the files of the Commonwealth and was stored in the Commonwealth's

Archives, fits within this definition of a public record.[5]

The Estate argues that the statutes cited by the United States and the Commonwealth

do not support the claim that the Letter is a public record because such a broad interpretation

"would mean nearly everything in the hands of the Commonwealth or a subsidiary agency

would have to be construed as a public record." (Estate Mem. at 12).  In the instant case,

however, the Letter fits into specific criteria – it is an original document dated prior to 1800 (or

1870) received and maintained by the Commonwealth.   Any claim of overbreadth in the

definition of public document has no application in the instant case.

Moreover, the Estate's reliance on Freeman v. Town of Hudson, 714 F.3d 29 (1st Cir.

2013) for the proposition that public records are limited to documents with "indicia of

reliability" is unavailing.  (Estate Mem. at 12).  Freeman addressed the question whether a

transcript of a 911 call and two police department incident reports could be considered "official

public records," and therefore considered by the court without converting a motion to dismiss

---

[5] The regulations promulgated pursuant to the Public Records Act also define a public record broadly as,
      [a]ll books, papers, maps, photographs, recorded tapes, financial statements, statistical
      tabulations, or other documentary materials or data, regardless of physical form or
      characteristics, made or received by a governmental entity unless such materials or data fall
      within one or more of the exemptions found within M.G.L. c. 4, § 7, clause Twenty-sixth or other
      legally applicable privileges.
950 C.M.R. § 32.02.

into a motion for summary judgment.  The court held that the phrase "official public records" "when used in the present context" *i.e.* in the context of determining whether documents could be considered in connection with a motion to dismiss, is "limited, or nearly so, to documents or facts subject to judicial notice under Federal Rule of Evidence 201."  Id. at 36.  In contrast, the reliability or veracity of the content of the Letter is not at issue in the present dispute.  The Estate fails to explain how Freeman's discussion of "matters of public record" in the context of the standard for evidence a court can consider in deciding a motion to dismiss is at all relevant to what documents constitute "public records" under the relevant public records statutes.  The Freeman Court's analysis has no application to the instant case.

The Estate argues further that references in pleadings to the Letter being part of the Archives' "Collection," as opposed to being part of the Commonwealth's "public records' files" is evidence that, "despite the bravado of Plaintiff's Motion to Strike, it is far from clear that the Hamilton Letter is a public record: accordingly, the Plaintiff has not met its required burden and the Motion to Strike must be denied."  (Estate Mem. at 14).  However, the United States and the Commonwealth have been unwavering in their position that the Letter has always belonged to the Commonwealth, and the Estate is trying to make a distinction where none exists. Moreover, the fact that the Letter was part of the Archives' "Collection" simply confirms that it consistently has been treated as a public document which the Commonwealth was mandated to preserve and keep safely.  For all the reasons detailed herein, Letter constitutes a public record as a matter of law.

## D.  <u>The Letter is Owned by the Commonwealth</u>

The United States and the Commonwealth argue that, under both the modern Public

Records Act and the 1897 Act, only the Commonwealth may own an historic public record such

as the Letter and, therefore, regardless of how the Letter eventually came into the possession

of the Estate, only the Commonwealth may have legal title to the document.  The Estate, on the

other hand, argues that the statutory scheme allows for the Commonwealth to destroy or

abandon its public records, and, therefore, that the Estate is entitled to own the Letter.  As

detailed herein, the statutory scheme establishes that only the Commonwealth is entitled to

own original public documents from its files that pre-date 1870, such as the Letter.  Moreover,

even assuming, *arguendo*, that an individual could acquire title to a document voluntarily

released by the Commonwealth, the Estate has failed to meet its burden of proving that it

lawfully acquired title to the Letter.

Under the 1897 Act, the secretary of the Commonwealth is tasked with maintaining

custody of the public records of the Commonwealth "when no other disposition of such records

is made by law or ordinance."  1897 Act at Section 3.  With respect to the documents in the

Commonwealth's custody, the 1897 Act provides in relevant part that

> [e]very original papers belonging to the files of the Commonwealth . . . bearing a date earlier than the year eighteen hundred . . . shall be safely kept, **and every other paper** belonging to the files of the Commonwealth . . . shall be safely kept for seven years after the latest entry originally made therein or thereon unless required by law to be destroyed at some other time, and no such paper of any county, city or town shall be destroyed unless such destruction is approved by the commissioner of public records.

1897 Act at Section 4 (emphasis added).  Pursuant to Section 9 of the 1897 Act,

> [e]very person who is given by law the custody of any public records shall have power to demand, and shall demand, any such record from the person having the same in his possession, and such person shall forthwith deliver such record to such custodian. . . .

Moreover, the 1897 Act provides that "[e]very person who unlawfully keeps in his possession any public record" shall be fined.  1897 Act at Section 12.

The present statutory scheme makes it even clearer that the Commonwealth is the sole entity which owns the original documents dated before 1870 and received and maintained by the Commonwealth in its files.  Like the 1897 Act, the modern Public Records Act provides that the Commonwealth must maintain custody of public records of the Commonwealth "if no other disposition of such records is made by law or ordinance[.]"  Mass. Gen. Laws ch. 66, § 7.  However, pursuant to Mass. Gen. Laws ch. 66, § 8 it is now clear that not only must the documents be "safely kept" but they must be "preserved."  Thus, the statute now provides that "[e]very original paper belonging to the files of commonwealth or of any county, city or town, bearing date earlier than the year eighteen hundred and seventy . . . shall be preserved and safely kept[.]"  See 1902 Mass. Rev. L. ch. 35, § 14 (USA Mem. Ex. E).  The statutory scheme also was expanded so that whoever is entitled to custody of a public record may seek recourse in court in order to have such records returned.  See Mass. St. 1951, c. 200 (USA Mem. at Ex. G).  Specifically, Mass. Gen. Laws ch. 66, § 13 now provides:

> Whoever is entitled to the custody of public records shall demand the same from any person unlawfully having possession of them, who shall forthwith deliver the same to him.  Upon complaint of any public officer entitled to the custody of a public record, the superior court shall have jurisdiction in equity to compel any person unlawfully having such record in his possession to deliver the same to the complainant.

Moreover, over the years the penalties "for the unlawful possession of any public record" have expanded to include "imprisonment for not more than one year" in addition to a fine.  See Mass. Gen. Laws ch. 66, § 15; Mass. St. 1951, c. 200 (USA Mem. Ex. G).  The statute also provides that "[a]ny public officer who refuses or neglects to perform any duty required of him

[17]

by this chapter [66]," such as preserving and safely keeping historic public records, shall also be fined during the period of such neglect.  Id.

In sum, the statutory scheme provides that the Commonwealth has custody of and is responsible for preserving and safely keeping historical documents such as the Letter.   The Estate, nevertheless, argues that the statutory scheme, and in particular, Mass. Gen. Laws ch. 66, § 8, addresses not only preservation, but also the destruction of public records.  (See Estate Mem. at 13-14).  However, the statutory scheme is clear that the authority to destroy records does not apply to original documents that pre-date 1870.

Mass. Gen. Laws ch. 66, § 8 provides in its entirety as follows:

> **Every original paper belonging to the files of the commonwealth** or of any county, city or town, **bearing date earlier than the year eighteen hundred and seventy,** every book of registry or record, except books which the supervisor of public records determines may be destroyed, every town warrant, every deed to the commonwealth or to any county, city or town, every report of an agent, officer or committee relative to bridges, public ways, sewers or other state, county or municipal interests not required to be recorded in a book and not so recorded, **shall be preserved and safely kept; and every other paper belonging to such files shall be kept for seven years after the latest original entry therein or thereon,** unless otherwise provided by law or unless such records are included in disposal schedules approved by the records conservation board for state records or by the supervisor of public records for county, city, or town records; **and no such paper shall be destroyed without the written approval of the supervisor of records.** Notwithstanding the foregoing, the register of deeds in any county may, without such written approval, destroy any papers pertaining to attachments or to the dissolution or discharge thereof in the files of his office following the expiration of twenty years after the latest original entry therein or thereon, unless otherwise specifically provided by law, and he may destroy all original instruments left for record and not called for within five years after the recording thereof.

(Emphasis added).  The phrase "and every other paper" creates a separate and distinct class of documents subject to disposal, which documents do not include the "original papers" belonging to the Commonwealth that pre-date the year 1870.  See Moulton v. Brookline Rent Control Bd., 385 Mass. 228, 230-32, 431 N.E.2d 225, 227 (1982) ("It is the general rule of statutory as well as

grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation").[6]  The semicolon inserted before "every other paper" reinforces the conclusion that original papers, pre-dating the year 1870, "must be preserved and safely kept," and are not part of the class of documents that may be destroyed.  See Globe Newspaper Co. v. Boston Ret. Bd., 388 Mass. 427, 434, 446 N.E.2d 1051, 1056 (1983) (noting the insertion of a semicolon into the statute at issue "shatter[ed] the unity of the phrase" and was an intentional measure by the legislature to establish a separate category).  Accordingly, the Public Records Act does not provide the Commonwealth with authority to destroy original documents, like the Letter, belonging to the Commonwealth and dated prior to the year 1870.

Finally, the Estate argues that the United States cannot prove the Letter was not "abandoned" by the Archives and, therefore, the Letter could have been lawfully possessed by the documents dealer that sold the Letter to R.E. Crane.  This argument is unavailing.  As an initial matter, the Estate has cited to no authority for the Commonwealth to have sold the historic Letter.  The Estate cites to Mass. Gen. Laws ch. 66, § 8 for authority to abandon a public record, but § 8 provides authority only to destroy certain records under certain circumstances that, as discussed above, do not apply to history documents.[7]  Moreover, even assuming that

---

[6] As quoted above, the distinction between original papers belonging to the files of the Commonwealth dated prior to 1800 "and every other paper" was also included in Section 4 of the 1897 Act.  The historic records are not included in those which may be destroyed if "required by law" and "approved by the commission of public records."  Id.

[7] At oral argument, counsel for the Estate raised the possibility that the Letter was old and brittle and had undergone photocopying as a means of preserving it, before being discarded.  Section 9 of Chapter 66, however, provides for the preservation and copying of worn records, and likewise does not allow the abandonment of such records.

the Commonwealth could "abandon" a public record, the Public Records Act requires the preservation of documents dated earlier than 1870, and, therefore, any abandonment of the Letter would have been unlawful.  The statutory scheme requires that to the extent that public records (unlike the Letter) can be destroyed, the destruction must be authorized.  See, e.g., Mass. Gen. Laws ch. 66, § 8.  The Estate has put forth absolutely no evidence or indication that the Commonwealth authorized the destruction or abandonment of the Letter.

The Massachusetts statutory scheme is consistent with how numerous other jurisdictions treat historic public records, which "are the property of the state and not of the individual who has them in his or her possession."  66 Am. Jur.2d Records and Recording Laws, § 11 (August 2020).  (See USA Mem. at 12, n. 7).  As one court convincingly expressed the relevant principles:

> It is a well settled principle of law that title to government property may pass only in the manner prescribed by the duly constituted legislative body and that title to any such property may not be forfeited through the oversight, carelessness, negligence, or even intentional conduct of any of the agents of the government. See U.S. v. Mallery, 53 F. Supp. 564 (Wash.1944). This legal principle applies to government land, personal property or public records. The underlying rationale of this rule is that property owned by the government is held in trust for the people and that the intentional or negligent acts of the agents of the government should not serve to deny the people of the benefits and enjoyment of 'their' property. See Bartholomew v. Staheli, 86 Cal.App.2d 844, 195 P.2d 824 (1948).

State v. West, 31 N.C. App. 431, 441–42, 229 S.E.2d 826, 831–32 (1976), aff'd, 293 N.C. 18, 235 S.E.2d 150 (1977).  For all these reasons, the Commonwealth is the rightful owner of the Letter.

## E.  The Innocent Owner Defense Is Not Applicable

The Estate claims that the Letter is exempt from forfeiture under the innocent owner defense. The burden is on the Estate to prove that it is an innocent owner.  18 U.S.C. § 983(d)(1).  For the reasons detailed herein, this defense is not available to the Estate.

Section 983(d) of CAFRA provides that,

> (1)  An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute.  The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.
>
> …
>
> (3)(A)  With respect to a property interest acquired after the conduct giving rise to the forfeiture has taken place, the term "innocent owner" means a person who, at the time that person acquired the interest in the property –
>
>> (i)      Was a bona fide purchase or seller for value (including a purchaser or seller of good or services for value); and
>>
>> (ii)     Did not know and was reasonably without cause to believe that the property was subject to forfeiture.

18 U.S.C. § 983(d).  CAFRA also includes an exemption to the innocent owner defense:

> (4) Notwithstanding any provision of this subsection, no person may assert an ownership interest under this subsection in contraband or other property that it is illegal to possess.

18 U.S.C. § 983(d)(4).  For the reasons detailed herein, this court concludes that the exemption applies, and the Estate cannot maintain possession of the Letter which it was required by statute to return upon demand.

The statute does not define a "bona fide purchaser for value," but some courts have looked to interpretations of similar language in the Continuing Criminal Enterprise Act, 21 U.S.C. § 853 (n)(6)(B), which generally construes a bona fine purchaser for value "liberally," as "'all persons who give value . . . in an arms'-length transaction with the expectation that they would receive equivalent value in return.'" U.S. v. 198 Training Field Road, 2004 WL 1305875, at *2 (D. Mass. June 14, 2004) (quoting U.S. v. Reckmeyer, 836 F.2d 200, 208 (4th Cir. 1987)). Here the Estate contends that it was a bona fide purchaser for value of the Letter based on

family lore of R.E. Crane's alleged purchase of the Letter in around 1945 from John Heise

Autographs, owned by Elmer V. Heise, a reputable historical documents dealer in Syracuse,

New York.  (See Estate Mem. at 15).  As noted above, the only evidence the Estate has of this

transaction is a post-marked envelope from John Heise Autographs addressed to R.E. Crane at

his business address in Ford City, Pennsylvania.  (Id.).  The Estate further asserts that no

member of the Crane family ever knew the Letter was stolen.  (Id. at 17).  The United States

and the Commonwealth challenge the sufficiency of these conclusory assertions, and question

whether a truly reputable dealer and buyer would not have known of the document's "true

provenance" given the type of correspondence in question, the law preventing the

Commonwealth from alienating such documents, and the publicity about the theft.  (See

Commonwealth Mem. at 3 & n. 1; USA Mem. at 14).  In any event, these disputed facts do not

need to be resolved at this time, since, even assuming that the Estate qualifies as a bona fide

purchaser for value,[8] the exemption to the bona fide purchaser defense applies.

---

[8] In light of this assumption, this court will not address the Estate's argument that there has to be proof of actual knowledge of wrongdoing to preclude a purchaser for value from being a bona fide purchaser under CAFRA.  (See Estate Mem. at 16).  This court does note, however, that the law is "well-settled" that "when a thief sells chattels, even to an honest purchaser, no title passes, and the owner may maintain an action for the property without a previous demand."  Heckle v. Lurvey, 101 Mass. 344, 345 (1869).  See also Farm Bureau Mut. Auto. Ins. Co. v. Moseley, 47 Del. 256, 90 A.2d 485, 488 (1952) ("The general rule is well established that no one can transfer a better title to personal property or chattels than he himself has. . . .  Even a bona fide purchaser acquires no title to property which has been stolen") (citing Heckle and other cases); Motors Ins. Corp. v. State of South Carolina, 313 S.C. 279, 282, 437 S.E.2d 555, 557 (1993) ("Because a person can pass to his successor no greater title than he acquired, a thief or one in the subsequent chain of title cannot grant good title to stolen property, even to a bona fide purchaser."); In re Paysage Bords De Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir, 991 F. Supp. 2d 740, 744-745 (E.D. Va. 2014) ("even a good-faith purchaser for value cannot acquire title to stolen goods"); Brown Univ. v. Tharpe, No. 4:10CV167, 2013 WL 2446527, at *11 (E.D. Va. June 5, 2013) ("a thief cannot pass title to stolen goods even to an innocent purchaser who pays for the stolen goods.") (citation omitted).

As detailed above, the innocent owner defense is not available in the case of

"contraband or other property that is illegal to possess."  18 U.S.C. § 983(d).  "Contraband" is

identified separately from "property that is illegal to possess" in the statute, and the latter is

not limited to property that is *per se* illegal to possess.  Rather, "illegal to possess" includes

property that "becomes illegal to possess because of extrinsic circumstances."  144,774

Pounds of Blue King Crab, 410 F.3d at 1135.  It "includes items that may be legally possessed in

some circumstances but that become illegal to possess in others."  Id. (purchaser of king crab

caught and imported into the United States in violation of federal law could not assert an

innocent owner defense in forfeiture proceedings: while the possession of crab is not

"inherently unlawful," it was "illegal to possess" the shipment in question because it was

imported, received or acquired in violation of federal law).  See also U.S. v. 186,675 Board

Feet and 11 Doors and Casings, More or Less, of Dipteryx Panamensis Imported from

Nicaragua, 587 F.Supp.2d 740, 751 (E.D. VA 2008) (claimants cannot assert innocent owner

defense in forfeiture action because it was "illegal to possess" wood that was imported into

the United States in violation of federal law), *aff'd sub nom.* U.S. v. Thompson, 332 F. App'x

882 (4th Cir. 2009).  In the instant case, persons who have taken possession of a public record

are obligated to return the public document to its governmental custodian on demand, and

the failure to do so subjects the person retaining the public record to fines and/or

imprisonment.  Mass. Gen. Laws ch. 66, §§ 13, 15.  It is illegal for the Estate to possess the

original 1780 document that belongs to the Commonwealth.  Therefore, the Estate cannot

assert an innocent owner defense.[9]

The Estate argues that there is insufficient evidence to prove that the Letter was stolen.

While this court does find the evidence submitted by the Commonwealth persuasive, this issue

does not need to be finally resolved.  Where, as here, there is no authority for the

Commonwealth to divest itself of pre-1870 original documents maintained in its files, and it

has demanded the return of the Letter, the Estate's possession of the Letter is illegal under

CAFRA. 18 U.S.C. § 983(d)(4).  See $75,000 in U.S. Currency, 97 F. Supp. 3d at 3 (holding that

because lottery tickets could not be brought into the United States legally, they were illegal to

possess under 18 U.S.C. § 983(d)(4) and granting government's motion to strike a claim under

CAFRA for lack of standing as no ownership interest can be established in the seized property);

U.S. v. Approx. 236 Firearms and 11,376 Rounds of Ammunition, No. 3:12-cv-00115, 2014 WL

12575724, *4 (S.D. Iowa Apr. 28, 2014) (where claimants are precluded from obtaining a

federal firearms license as a matter of law, they cannot legally possess the guns and

ammunition at issue, and cannot assert the innocent owner defense under 18 U.S.C. §

983(d)(4)).[10]  The results are the same whether the Commonwealth was deprived of its

---

[9] Since this court concludes that it was illegal for the Estate to possess the Letter under CAFRA, it will not reach the claim of the United States that the Estate could be liable  for possession of stolen or unlawfully converted property under 18 U.S.C. §§ 2314-15 and Mass. Gen. Laws ch. 266, § 60.  (See USA Mem. at 17).

[10] U.S. v. North Carolina's Original Copy of the Bill of Rights, No. 5:03-CV-2204-BO, 2004 WL 3609349 (E.D. North Carolina, Feb. 19, 2004), vacated (for lack of jurisdiction due to settlement) and remanded sub nom. In re Matthews, 395 F.3d 477 (4th Cir. 2005) is also instructive.  There, the Court held that an allegedly stolen Original Copy of the Bill of Rights satisfied North Carolina's three-part test for official state documents.  The Court explained that, "even if [the claimant] or any other party purchased or otherwise possessed North Carolina's Original Copy of the Bill of Rights outright, this illegal possession did not dissolve the State of North Carolina's lawful possessory interest in the document because there

property "by theft or other illegal act." U.S. v. Barnard, 72 F. Supp. 531, 532-33 (W.D. Tenn. 1947).

Finally, the Estate indicates that at a minimum it should be entitled to cash compensation in exchange for the Letter. (See Estate Mem. at 19, n.5). 18 U.S.C. § 983(d)(5)(B) provides that, "[i]f the court determines . . . that an innocent owner has a partial interest in property otherwise subject to forfeiture . . . the court may enter an appropriate order . . . transferring the property to the Government with a provision that the Government compensate the innocent owner to the extent of his or her ownership interest once a final order of forfeiture has been entered and the property has been reduced to liquid assets[.]" This Court finds that this provision does not apply here, where the Estate does not have any ownership interest in the Letter, and the item forfeited will not be liquidated.[11]

---

has never been a legally authorized means of selling, forfeiting or abandoning public documents of the State of North Carolina." 2004 WL 3609349 at *3. While the North Carolina public records law differs from that of the Commonwealth, the reasoning that the state need not prove a public record was actually stolen to retain its ownership interest in that document applies to the instant case, as the Massachusetts Public Records Act likewise does not provide for transferring ownership of a document of the Commonwealth dated earlier than 1870.

[11] The Estate also cites to a New Jersey Supreme Court decision, Okeeffe v. Snyder, 83 N.J. 478, 499, 416 A.2d 862, 873 (1980) for the proposition that "not all property claimed to have been stolen is automatically returned to its alleged rightful owner." (Estate Mem. at 16). In Okeeffe, the court held that the discovery rule governed the statute of limitations in an action for replevin of stolen artwork under New Jersey law. Okeeffe, 83 N.J. at 498, 416 A.2d at 872-73. Okeeffe, which has no precedential value in the instant case, does not address either public records or a statutory scheme such as that found here. The New Jersey court also fails to address the well-established line of cases holding that one who lacks good title cannot sell good title, even to a bona fide purchaser. According to the Okeeffe Court, "[u]nder the U.C.C. entrusting possession of goods to a merchant who deals in that kind of goods gives the merchant the power to transfer all the rights of the entruster to a buyer in the ordinary course of business." Id., 83 N.J. at 499, 416 A.2d at 873. Here, there is no evidence that the entruster ever had good title to the Letter. In any event, this court declines to follow the dicta in Okeefe.

## F.  **The Doctrine of Laches is Inapplicable**

Finally, the Estate argues that the United States and Commonwealth "waited over 7 decades before doing anything to recover what it believed to be a stolen document" and that, as a result, the Commonwealth's claim and the United States' action are barred by the doctrine of laches.  This argument is unsupported by the facts and the law.

"The equitable doctrine of laches bars assertion of a claim where a party's delay in bringing suit was 1) unreasonable, and 2) resulted in prejudice to the opposing party."  K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989).  Laches is an affirmative offense, and the Estate "has the burden of proving both unreasonableness of the delay and the occurrence of prejudice."  Id.  Significantly, "the laches defense is generally inapplicable against a State."  Illinois v. Kentucky, 500 U.S. 380, 388, 111 S. Ct. 1877, 1883, 114 L. Ed. 2d 420 (1991) (and authorities cited).

In the instant case, the record is clear that the Commonwealth notified police when the theft was discovered and publicized the theft in a number of places.  At some point the missing document was listed in a national database so that sellers could determine that the document was "missing" from the Archives.  Once notified of the potential sale of the Letter by the Estate, the government acted swiftly in seeking its return.  While no conclusive ruling needs to be made on this affirmative offense, the claim of laches does not appear to be supported by the factual record.  Moreover, the Estate has not established any prejudice by the delay.  The family enjoyed its possession of the Letter.  No events over the years could change the fact that the Commonwealth could not legally give up its ownership of the Letter.

Finally, the public policy against applying laches to the government is particularly compelling in the instant case.  "The public interest in preserving public rights and property from injury and loss attributable to the negligence of public officers and agents, through whom the public must act, justified a special rule for the sovereign."  Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 294, 103 S. Ct. 1811, 1824, 75 L. Ed. 2d 840 (1983) (O'Connor, J. dissenting).  Here, whether there was a theft (as the facts seem to indicate), or negligence which resulted in the Commonwealth losing possession of an historic document, the public should not be deprived of part of their history.

## V.  CONCLUSION

For the forgoing reasons, the United States' Motion to Strike (Docket No. 24) is ALLOWED and the Estate's Motion to Dismiss (Docket No. 28) is DENIED as moot.

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge